```
1          IN THE UNITED STATES DISTRICT COURT FOR
             THE WESTERN DISTRICT OF WASHINGTON
2                         AT SEATTLE

3  UNITED STATES OF AMERICA,      )
                                  )  Case No. CR04-275L
4             Plaintiff,          )
                                  )  Seattle, Washington
5        v.                       )
                                  )  January 6, 2006
6  ELROY LAMONT,                  )
                                  )  SENTENCING
7             Defendant.          )
   _____)
8

9

10               TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE RICHARD S. LASNIK
11              UNITED STATES DISTRICT JUDGE

12

13
   For the Plaintiff:      VINCE LOMBARDI, ESQ.
14

15 For the Defendant:      TIMOTHY LOHRAFF, ESQ.
                           NANCY TENNEY, ESQ.
16

17

18

19
   SUSAN A. ZIELIE, RPR, CCR
20 Official Court Reporter
   U.S. Courthouse
21 700 Stewart Street
   Seattle, Washington 98101
22 (206) 370-8509

23 Proceedings recorded by computer-aided stenography.

24

25
```

SEATTLE, WASHINGTON; FRIDAY, JANUARY 6, 2006

11:30 A.M.

THE CLERK:  Case C04-275L, United States vs. Elroy Lamont.  Counsel, would you please make your appearances.

MR. LOMBARDI:  Morning, Your Honor, Vince Lombardi for the United States.

THE COURT:  Hi, Mr. Lombardi.

MR. LOHRAFF:  Hi, Your Honor.  Tim Lohraff and Nancy Tenney on behalf of Elroy Lamont, who is seated to my right.

THE COURT:  Hi, Mr. Lamont, Mr. Lohraff and Ms. Tenney.  We're here for sentencing on Mr. Lamont's plea of guilty to making a false threat to use explosive materials by interstate commerce.  This is a Class C felony with a violation alleged of 18 United States Code Section 844(e).  The maximum sentence is 10 years imprisonment and a $250,000 fine.

I've reviewed in preparation for the sentencing today Mr. Banks's excellent Presentence Report -- thank you to Mr. Banks -- I have the United States' sentencing memorandum from Mr. Lombardi, and I have the sentencing memorandum on behalf of Elroy John Lamont, which was prepared by Mr. Lohraff and Ms. Tenney, and which includes a number of exhibits

including reports by a number of experts who have examined Mr. Lamont and his history. Those are, I think, six exhibits attached to the sentencing memorandum. So -- and then I guess I have something, as I sat down today, an invoice from the Darrington School District regarding restitution.

So, Mr. Lohraff, do I have everything you wanted me to have in preparation for the sentencing today?

MR. LOHRAFF: That's correct, Your Honor.

THE COURT: And have you had an opportunity to go over the government reports with your client and make any additions or corrections?

MR. LOHRAFF: Yes, we have.

THE COURT: All right.

Mr. Lamont, are you ready to proceed to sentencing here this morning?

THE DEFENDANT: Yes, sir, I am.

THE COURT: Okay. Mr. Lombardi then.

MR. LOMBARDI: Thank you, Your Honor.

As set forth in our sentencing memorandum, Mr. Lamont committed a serious crime. When I was younger, I never made a bomb threat, but they weren't uncommon. And, although I don't think anybody thought they were that funny, if it was sort of along the lines

of a practical joke.  And, obviously, the world has
changed.  Not only terrorism, but if you look at
Columbine, other school shooting incidents, what
happened at Breslin in the former Soviet Union, we have
to take threats of this type very seriously, because
sometimes they turn out to be something more than a
threat.  And Congress recognized that by passing Section
844, which made it a federal crime to engage in this
conduct.  And Mr. Lamont's conduct was not casual, it
wasn't incidental.  He sent multiple bomb threats, three
to the Darrington School District, he also sent one to a
school back east.  He undertook fairly sophisticated
means of concealing the fact that they were coming from
him, and showed a certain amount of planning, and a
certain recognition of what he was doing was wrong at
least at some level.

And so, when we were first involved in this
case and it was first charged, certainly my personal
feeling and the feeling of the office was that some
period of incarceration was going to be called for.
But, over time, as we got to know Mr. Lamont a little
bit better, as we got a chance to see how he was doing
under pretrial supervision, read some of the reports
that were prepared about his mental condition -- which
by the way was diagnosed well before the offense, this

is not a case where the government was looking at somebody who has committed a crime and then suddenly after the fact he's suddenly diagnosed with a mental defect and you find yourself wondering is this something that's really true or is it an excuse. Here, there's no dispute that Mr. Lamont had been diagnosed well before any of the criminal conduct at issue in this case. As we looked at all those facts, and in particularly the progress that he'd made since this crime occurred, it was our judgment that incarceration was not called for for a couple of reasons. One, his age. He was barely 18 at the time it happened. And two, more important, his mental condition, which certainly, although doesn't excuse what he did, again, he clearly understood that what he was doing was wrong, it certainly mitigated, we thought, his culpability. And finally, and perhaps most important, since the goal here is not just punishment, it's rehabilitation, our conclusion based on the reports was that incarcerating him would cause him to probably go backwards. Someone with his condition is not going to do well in prison. And, he had made so much progress while on supervision, in our judgment, seemed to better thing to do would be to continue those conditions, continue having him in a structured environment where he can become a productive member of society, and avoid

doing anything similar in the future.  Incarceration didn't seem to serve a purpose under those conditions.

So, for that reason, we did enter into a plea of guilty before the Court where we stipulated that probation is the appropriate sentence, and we continue to believe that that is correct.

There two issues, however, that have not been settled before the Court between the parties.  The first being.  Whether or not some type of community service is called for; and, the second, the amount of restitution.  And I'd like to just briefly address those in turn.

Community service, as set forth in our memoranda and NPSR, both probation and the government think 50 hours of community service is appropriate.  It's no an overwhelming amount.  We think it's necessary because, again, this was a serious crime, and Mr. Lamont is not going to do any jail time, but there should be some sanction for what he did.  And community service seems to be appropriate.

As I understand the defense objection, their concern is that, given his state, given the progress he's made, they seem to believe that doing any community service runs the risk of causing him to not be able to continue to make progress.  And we believe that concern

is not well-founded for a couple of reasons.  One,
community service is a flexible concept.  And, I've had
a chance to talk to probation, I believe Mike Larsen is
going to be the supervising probation officer.  He has a
lot of experience in working with people with just Mr.
Lamont's condition.  As referred to in our memo, Mr.
Lamont is not the first defendant with Asperger's
Syndrome that's come through our office or come through
probation.  There was a prior case involving someone who
was sort of Mr. Lamont's mirror image, the Alberg case,
which the Court may be familiar with from the press.  He
was making very dangerous things but not really
threatening anybody with them.  Mr. Lamont was
threatening people but had no intent or ability to make
anything to carry out any of the threats.  But Mr.
Alberg has gone through the system with, unfortunately,
not great success; but, nonetheless, I think we've
learned from that experience, and I believe both
probation and our office is confident that the community
service can be administered in a way that in the end may
well be a benefit to Mr. Lamont, not a hindrance, and
certainly administered in a way that would be flexible
and takes into account his unique needs.

          And, when you think about it, community
service is a punitive sanction, but it's not like going

1    to jail.  In fact, most kids and most high schools now

2    have to do community service to graduate.  It's

3    considered to be something that's part of your

4    educational experience.  And I would anticipate that

5    probation would approach it in that light, they would be

6    looking for something that is appropriate for his

7    abilities and for his special need.  And, if they don't,

8    the Court retains jurisdiction.

9         If there is a problem with community

10   service, it will ultimately come back before Your Honor,

11   and you'll have the ability to determine whether or not

12   it was handled appropriately.  It's certainly not my

13   office's intention, and I know it's not probation's

14   intention, to set him up to fail.  Because, if that was

15   our goal, we wouldn't have pursued this particular plea

16   structure in the first place.  But we do believe that

17   some sanction is appropriate here over and above the

18   fact that he has a felony conviction.

19        Turning to the restitution amount, that

20   turns out to be somewhat of a more difficulty.  As you

21   mentioned, you have an invoice in front of you.  We

22   received early on in the case an invoice from the

23   Darrington School District reflecting their estimate as

24   to the total costs to them in dealing with this

25   incident.  And the defense quite appropriately said this

is a little vague, we'd like some more detail.  And we
endeavored to work with the school district to come up
with that detail.  And what the Court has in front of
you is what we got back from the school district.

I had a chance to talk to the person who put
that together.  And, when I asked them how they came up
with the number, there's not a whole lot beyond it,
other than what you see on the paper in front of you.
It is their best guess as to the additional time and
cost that resulted from Mr. Lamont's activities.  And,
when you ask for more details, how did you come up -- as
you'll see in the invoice, it's 40 hours -- how did you
come up with 40 hours, there's not a lot more of an
answer, other than it just seemed right.  So there is a
dispute as to the appropriate amount of restitution.

Obviously, restitution is called for in this
case.

I can tell you the general categories, it
was administrative staff, time that they dealt with.  In
my mind, there's an issue with that, because most
administrative staff are salaried.  I don't know that
the school district has actual costs from people
spending extra time at work dealing with it.

Some of the other ones seem to be more
appropriate.  Custodial staff are not salaried; and, if

they're spending time outside of school helping with the

bomb search, that sort of thing, that is a cost that

would seem appropriate.

Computer time, there was a lot of time dealt

with or devoted to track down where these emails came

from, how they came into the system, that seems to be

appropriate.

Unlike a typical case where it's bank

robbery or someone's been injured and you have a

hospital bill, and the restitution amount is what it is,

here, it's an incremental cost that's a soft cast, and

all we really have is a best estimate.  Court can award

restitution based on that amount.  And that is all the

information, unfortunately, we're able to produce at

this time.

THE COURT:  Okay.

MR. LOHRAFF:  Thank you, Your Honor.

THE COURT:  Thanks, Mr. Lombardi.  And I

appreciate the very responsible way your office went

about approaching this unusual case.

Mr. Lohraff.

MR. LOHRAFF:  Good morning, Your Honor.

Elroy, his mother is here, Nancy McKinney.  I'd like to

represent her to the Court.

THE COURT:  Thank you.

1      MR. LOHRAFF:  And she's now married to Dean

2  McKinney, who is here also, who would be not Elroy's

3  biological father, but is his stepfather.  They are here

4  in support of Elroy.

5      THE COURT:  Great.

6      MR. LOHRAFF:  I do want to -- I had a

7  conversation with both Mr. Lombardi and Mr. Banks, and

8  in fact numerous conversations that we've had over the

9  course of this with Nancy and I, and I certainly am

10  appreciative that we're in Seattle, the district --

11  Western Washington District.  I think this case was

12  handled very professionally and very appropriately, and

13  I thank the government for that and for probation.

14      And I also would like to thank Jennifer

15  Davis from our office who is an investigator, that's

16  sitting with Mr. and Mrs. McKinney, who has spent a

17  tremendous amount of time, hours and hours and hours

18  getting Elroy set up into the EDCAP program and helping

19  him to achieve the incredible success that he's had

20  since he was arrested on this case until he sits here

21  today in front of Your Honor.

22      And I do think this is an extraordinary

23  case.  It's maybe one of those very, very rare cases

24  where I can look at the Court and say, in all sincerity,

25  that it's possibly one of the best things that's ever

1   happened to Elroy.  He has changed his life.  He is now

2   getting his high school diploma and getting it not

3   through a GED program but taking classes and also taking

4   career classes that are going to be applicable to

5   college.  He's living on campus in a dorm room.  He's

6   turned his life around and has made an incredible amount

7   of success on many levels.  And we ask the Court to take

8   cognizance of that.

9           And I also just wanted to congratulate Elroy

10  himself as to what he's done.  I think that he's done an

11  amazing job.  And he's had help getting placement and

12  getting help being where he's able to do this; but,

13  ultimately, it rests on his own shoulders, and he's

14  risen to the challenge and met those challenges and

15  consistently met them.  And, biking around Edmonds,

16  getting his groceries, and doing his homework and going

17  to class.  And it's pretty amazing.  And it's a really

18  nice success for me to stand in federal court and see

19  this transformation of a young man.

20          So I don't think that the parties are far

21  apart on much here at all, but there are a couple of

22  significant things that I would like to raise with the

23  Court that Mr. Lombardi addressed them.

24          As far as community service goes, I broached

25  that with Dr. Breen, and I attached a letter that

1    Dr. Breen wrote.  We are concerned.  I think basically

2    our viewpoint is that Mr. Lamont is doing community

3    service, he's been doing it for the last number of

4    months, being involved and enrolled in the Edmonds EDCAP

5    Community College, high school diploma, educational

6    things that he's doing right now, taking the classes,

7    living on campus.  That's an amazing thing that he's

8    doing.  It's particularly, amazing given his background,

9    given the fact that he was -- hasn't gone to school

10   since sixth grade.  And what he's doing now, and we view

11   that is the community service, he's doing it.  And he's

12   changing his life.  He's doing an amazing thing.  We're

13   certainly not trying to shirk responsibility or trying

14   to get out or evade anything.  What we would like is

15   just we want Elroy to succeed.  He's on this path of

16   success, and we'd lake to see it continue.

17          Restitution is also a troubling issue

18   because, again, we're not trying to evade responsibility

19   or not address what is legitimately due; but, on the

20   other hand, we don't want to see Elroy, who's right now

21   actually has not even enough money to go to school, he's

22   19 years old, he's going to school full time, and we

23   don't want to see -- the hand-out that I got today is

24   very vague, I don't see any specific employee names.  I

25   notice that all the hours -- for everything, it says 40

1    hours plus benefits.  There's no -- it's extremely

2    vague.  And I think that it's -- it would be very

3    difficult -- I don't think, under the law, that the

4    Court can assess $5,381 in restitution, that Mr. Lamont

5    should have to pay, based upon what's before the Court,

6    I guess is what I'm saying.  I don't want to see the

7    Darrington's School District budgetary short-falls

8    addressed on the back of my client.

9              That being said, I don't also want him to

10   not have to pay for what he legitimately did.  But I'm

11   also, as his attorney, saying here that we do object to

12   the vague and very unsubstantiated nature of what's been

13   presented.  I'm not saying that the government hasn't

14   tried to obtain better documentation.  But what's been

15   provided, I think, is not sufficient at this point.

16             The other thing that I would like to

17   address, just two other minor things.  One of the

18   conditions asked for in Mr. Banks's excellent PSR

19   recommendation -- and I do concur with the Court in the

20   fact that this was an excellent PSR, and that I know

21   that Mr. Larsen and Mr. Banks both went up to interview

22   Elroy at -- instead of him coming down here, so as to

23   not disrupt his education, they went up to Edmonds and

24   visited on campus, and actually visited with his

25   counselor, and went the extra mile in this case, which

everyone has been able to do, and we appreciate that

very much.  One of the recommendations is for drug

testing.  I simply am concerned that there's really no

evidence that Mr. Lamont's ever used drugs, has an

indication that he wants to use drugs.  And I'm trying

to avoid having him travel to Seattle or some place and

lose school time that I'm not sure is warranted.  So I

would object for the record for that.

          And, finally, there's a provision, I think

it's No. 12 in the PSR, about his not using the Internet

without prior approval.  And, again, right now, with the

pretrial services, the way it's worked out is that he

uses computers to access the Internet on campus, school

computers, and that's monitored, but he can't use his

own private computer to do that.  He can only use that

to do his homework in Word and Excel.  And so -- on the

other hand, I don't think there's going to be any

problem with that.  I just want to raise this, that he's

currently in compliance.  And, hopefully, when he meets

with probation today, after this hearing, we can get

that ironed out.

          We have no objection to him being monitored,

we have no objection to obtaining probation's approval.

We just want to make sure that there's a continued

accessibility, and that that isn't stopped for any time

1  period.  And, again, it's just more of me red flagging

2  it out of maybe ultra concern, but not that I'm

3  objecting to that.

4           THE COURT:  Thank you.

5           MR. LOHRAFF:  I know that Mr. Lamont would

6  like to very briefly address the Court.

7           THE COURT:  Sure.

8           Mr. Lamont, please go to the podium.

9           THE DEFENDANT:  All right.  Thank you for

10  your time, Your Honor.  First off, I would like to

11  apologize for my actions.  No matter how much I think

12  about it, I can't think of why I did it.  Now that I

13  think about it now, all I did was waste people's time,

14  and I scared some people.  And I didn't want to harm

15  anyone.  I just thought of it as a joke at the time.

16  But now I realize how serious this is, and I see how it

17  has affected people.  I didn't want anyone to be

18  negatively affected.  And, for that, and what has

19  happened, I'm sorry.

20           And I'm thankful for all the good work and

21  efforts and services that I have gotten through all

22  this.  Thank you, Your Honor.

23           THE COURT:  Okay.  Thanks, Mr. Lamont.  Very

24  nice.

25           Mr. Lohraff, did you indicate to Elroy's

mom, does she want to talk to me or say anything?

MR. LOHRAFF:  I don't think so.

THE COURT:  Great.  Well, I appreciate you all being here.  And things happen -- very difficult to understand sometimes why they happen.  Everything that Elroy said is true, what he did was really bad, and he looks back on it now and doesn't know why he did it.  But, if he hadn't done what he did, we probably wouldn't be here today.  But he also wouldn't be where he is today.  So things happen for a reason.  Fortunately, nobody was hurt.

I'm sure it was extremely frightening for the parents, the children, the teachers, the administrators in the schools.  My wife is actually a special education teacher, she teaches a blended kindergarten with kids who have Asperger's and autism and regular kids.  And, they had a power failure yesterday, and it really frightened the kids.  You know how important routine is in your life, Elroy.  And, these kids, they're also used to routine.  And, when there's an event, like a bomb threat, and all of the sudden their routine is shaken up, it's hard on all the kids, but it's probably hardest on the kids like yourself who are used to routines and don't understand why things are off the way they are.

1     It's too bad you didn't get the kind of
2  special education that's out there earlier, and I know
3  your mom made some decisions that she looks back on and
4  regrets in that regard.  You needed to be around people.
5  People can be cruel, there's no doubt about that, and
6  say and do things they shouldn't do, but you have
7  potential that you're starting to tap into now.  And,
8  you know, there are many, many successful people who
9  have the same thing you have, but have been able to
10  learn enough social skills to get a good job, use the
11  talents they have, live a good life.  And you're well on
12  the way to doing that.
13     So, again, things happen for reasons that we
14  can't fathom, and sometimes -- nobody got hurt, you
15  ended up getting the attention you needed and deserved.
16  So, all things considered, I'm very proud of the way the
17  justice system has reacted.  You got two fabulous
18  attorneys working with you, an investigator who I know
19  this was a labor of love for her, this is why she went
20  to school, this is why she learned these things, so she
21  could get somebody who was in this place and end up with
22  them in another place.  And I know from Mr. Banks, too,
23  this is why he wanted to be a probation officer.  He
24  doesn't just want to be a probation officer to send
25  people to prison, he wants to help people's lives

1  improve; and, by doing that, the community improves.

2  And, likewise, Mr. Lombardi, his goal is to see that

3  justice is done, and sometimes justice means asking for

4  long prison terms, and sometimes it means going along

5  with a totally probationary sentence, as they did today.

6  So I'm very proud of everyone who handled this case, and

7  I'm not going mess it up now by doing anything

8  different.

9          The way I see the community service issue,

10 though, is a little bit different from what Mr. Lohraff

11 said.  What you're doing now is helping the community

12 because it's making you -- going to make you a positive

13 and productive member of the community, but it's helping

14 you achieve your potential, and that's great.  But I

15 think, in achieving your potential, we shouldn't

16 minimize the fact that that potential should be shared

17 with the community, because you have a lot to offer.

18 And there are things you can do, and I know that Mr.

19 Banks and Mr. Larsen will craft an appropriate community

20 service placement for you.  And one of things you can do

21 is talk to other kids.  You know, the new phrase is

22 quirky kids.  That's what I've heard now.  They don't

23 want people labeled Asperger's or autistic or Autistic

24 Spectrum Disorder or this or that, but a lot of these

25 kids are just a little bit different, they're a little

1  bit quirky.  They have odd movements, they have odd

2  habits, but they are really high-functioning in a lot of

3  ways.  And they can be a little bit hard for society to

4  understand.  I think it's good for these kids to see

5  someone like yourself who can say to them, you know, I

6  was where you were, and this is where I am now, and

7  there's a lot of hope out there for you.  I will trust

8  Mr. Banks and Mr. Larsen to come up with an appropriate

9  placement for you.  It may be that we delay the

10 community service for a year or so until you're more

11 stable.  I'm not saying it has to start right away.  But

12 I think 50 hours somewhere during these five years of

13 probation is something that you will feel good about

14 doing, that you will feel positive about doing.  And you

15 will be able to say, you know, I might continue to do

16 this on my own without anybody telling me to do it

17 because it makes me feel good and it makes me feel like

18 I'm doing something good for my community.  So I am

19 going to put you on the five years of probation.

20          There will be the usual standard conditions,

21 as well as the following special conditions.  You will

22 cooperate in the collection of DNA, you must not possess

23 any firearms or destructive device.

24          Mr. Banks, what about the drug testing

25 thing, is there any evidence of that being required?

1          PROBATION OFFICER:  No, Your Honor.  My only

2    take on it is Elroy is in a college environment, it's a

3    typical dorm setting.  And he is a little vulnerable

4    because he's limited on some of the social interactions,

5    his experiences with that.  And just, in the future, if

6    there should be a problem, we would like to have the

7    authority to intervene before it got bad.  And that was

8    my only thinking on it.  There's nothing in his past

9    what would reflect.

10          THE COURT:  I can always modify the

11    probation if that became a problem; couldn't I?  To

12    require it?

13          PROBATION OFFICER:  You could.

14          THE COURT:  Let's go that route.  I hear

15    what you're saying, but I don't want to get it in there

16    now and start it.  I'd rather modify if there's problem.

17          You will submit to search of your person,

18    residence, office, property, storage unit or vehicle,

19    conducted in a reasonable time and manner by probation.

20    And you will participate as directed by probation in any

21    mental health program or counseling program.  What

22    you're doing now is just great.  There was also some

23    talk about getting your parents some appropriate

24    education, and that's great too.  But that's what's

25    going on already is really good.

1        You shall complete 50 hours of community

2   service as approved and directed by probation.  And I'm

3   going to say just within the five years, but I'm going

4   to leave that to the discretion of probation office.

5        On restitution, I think that what I would

6   like to see -- and this again goes back to Mr. Lamont

7   being a person who'll be able to function in society,

8   who'll be able to get his own groceries, pay his own

9   bills, he has the ability and the life skills to do

10  this -- and one of those bills, if you will, should be

11  restitution.  Now, I can't say exactly how much the

12  Darrington School District is out.  I know it's not

13  $5,000.  I'm sure it's at least $1,000.  But what I'm

14  more concerned about is that Mr. Lamont pay a certain

15  amount per month, and get used to paying a bill.  And

16  I'm satisfied with setting the restitution at $300, and

17  that he pays over the five years, which is 60 months, $5

18  a month.  Anybody can come up with $5 a month just by

19  not buying that video game, or not buying those

20  pretzels, or whatever, or the soda pop.  I just want Mr.

21  Lamont to have the experience of saying, okay, a part of

22  my budgeting of what I have to do every month, my

23  routine is I set aside $5 and I mail it to or I give it

24  to my probation office, I give it to the clerk's office.

25  I have an envelope, I have a stamp.

1    I asked my 19 year old to put a stamp on an

2 envelope, and he said, Where does it go, Dad.  I would

3 like Mr. Lamont to have that life experience of maybe

4 addressing an envelope and putting a stamp on it as part

5 of his growth experience.  I'm much more concerned with

6 the certainty of the $5 a month payment than I am with

7 the total amount of money.  So that's what I'm going to

8 set with regard to restitution.

9    The defendant shall provide the probation

10 officer with access to any requested financial

11 information, and allow inspection of any personal

12 computers owned or operated by Mr. Lamont.  Mr. Lamont

13 shall notify probation of all the computer software that

14 he owns or operates.  Anything that he has, anything

15 that he acquires, anything he buys off eBay or

16 Electronic Detective or any of the other places, let

17 them know what you've got and what you're doing with it.

18 And Mr. Lamont shall consent to US probation conducting

19 ongoing monitoring of his computer hardware and

20 software, which may include the installation of hardware

21 or software systems which allow evaluation, and we'll

22 include retrieval and copying of data from the computer

23 or other electronic devices.  And Mr. Lamont shall not

24 use the Internet without prior approval of the

25 supervising probation office.  And that of course means

1    you can use it at your schooling, but elsewhere only

2    with prior approval of probation.

3               I will waive the fees because of the

4    restitution involved.  There's also a $100 special

5    assessment which is due immediately.

6               MR. LOMBARDI:  Your Honor, I just want to

7    make sure I understand what I'm writing on the judgment.

8    Is the Court make any finding as to the total loss?

9               THE COURT:  Well, I'm finding that the total

10   loss is approximately $1,000.  Although that is an

11   estimate also.  But I'm setting the restitution at

12   $300 --

13              MR. LOMBARDI:  Understood.

14              THE COURT:  -- as the reasonable amount to

15   be paid.

16              MR. LOMBARDI:  I'll show the form of

17   judgment to defense counsel.

18              (Pause in Proceedings.)

19              THE COURT:  Mr. Banks, for your statement of

20   reasons, the diminished capacity and all the reasons set

21   forth in the expert report justify the downward

22   departure.

23              PROBATION OFFICER:  Thank you, Your Honor.

24              MR. LOMBARDI:  Your Honor, may I approach?

25              THE COURT:  Yes, Mr. Lombardi.  Thank you.

I have signed the judgment in the case.

Mr. Lamont, this is such a great country, that even when you get exactly what you ask for, I still have to advise you that you have the right to appeal the sentence that I've imposed here today. So I'm going to tell you what your appeal rights are.

If you want to appeal the sentence, which you have the right to do, you must file that notice of appeal within 10 days of today. If you can't afford the costs of the appeal, the government will pay them for you. And, if you want an attorney for the appeal but cannot afford one, the Court will appoint an attorney for you and the clerk will assist you in preparing papers necessary for your appeal. Do you understand those rights?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. Great. Thanks. I wish you the very best. I am very excited to see the progress you've made, you should be very proud of yourself. And I know your parents are very proud of you. I know your attorneys are very proud you. And this probationary period should be an extension of using a little bit of the resources of the government to help give you what you really should have gotten.

You know, the United States government got

off a little cheap on you in the sense of it should have
been paying for your special education all those years
when you were being home schooled.  And this is another
way of giving you the attention you deserved.  Under the
law, under the federal law, you were entitled to a great
deal more than you ever had.  And this is a chance for
you to take advantage of some of those opportunities.
And I think, the more you learn about the syndrome you
have, whatever we call it, is it makes you different,
but you're still loved by your mom, you're a very
special person, and you have a lot of good skills that
mean you can be independent, you can have a job, you can
get through life, and be a productive and contributing
member of society.  And we won't name names, but there's
some people who may be like the richest man in the world
who is somewhere along that spectrum.  If you've ever
seen Bill Gates rocking, you know he's got some of those
same attributes.  And you can turn it into a complete
positive thing for you.  And I think, when we look back,
we will say, whoa, this is a great thing that happened
for you and for society, because you've got a lot to
offer, okay?

        THE DEFENDANT:  Thank you.

        THE COURT:  You're welcome.

        (12:07 p.m., Proceedings Concluded.)

CERTIFICATE


     I, Susan A. Zielie, Official Court Reporter, do hereby certify that the foregoing transcript is correct.


/S/ SUSAN A. ZIELIE, RPR, CCR
_____
Susan A. Zielie, RPR, CCR